**SO ORDERED.**

**SIGNED this 17 day of August, 2007.**



*Dale L. Somers*
Dale L. Somers
UNITED STATES BANKRUPTCY JUDGE

_____

Opinion Designated for On-Line Publication, But Not Print Publication

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| In Re:<br><br>**RANDY GENE KURTZ,**<br><br>       DEBTOR. | CASE NO. 05-18508-7<br>CHAPTER 7 |
| **UNITED STATES OF AMERICA,**<br><br>       PLAINTIFF,<br><br>v.<br><br>**RANDY GENE KURTZ,**<br><br>       DEFENDANT. | ADV. NO. 06-5118 |

OPINION DENYING THE PARTIES' OPPOSING

MOTIONS FOR SUMMARY JUDGMENT

This proceeding is before the Court on opposing motions for summary judgment.

The United States of America for the Social Security Administration ("Government") appears by U.S. Attorney Eric F. Melgren and Assistant U.S. Attorney Richard Schodorf. Defendant-debtor Randy Gene Kurtz appears by counsel Ted E. Knopp. The Court has reviewed the pleadings and is now ready to rule.

The Debtor has chronic liver disease and has had two liver transplants. At times, he has been unable to work because of this medical condition, and has qualified to receive Social Security disability benefits. But despite the condition, the Debtor was able to work full-time from August 2001 through April 2005. The Government claims he falsely represented to the Social Security Administration ("SSA") during those years that he was unable to work and was therefore entitled to receive disability benefits. As a result, the Government says, the Debtor is obliged to repay it over $54,000 in benefits. That debt, the Government adds, is one arising from false pretenses, false representations, or actual fraud, so it is excepted from the Debtor's discharge by § 523(a)(2)(A) of the Bankruptcy Code. The Debtor concedes he owes the benefit repayment debt, but contends he made no false representations because: (1) he was not aware he was supposed to report his jobs to the SSA, and if he was ever told that, his medical treatment caused him to forget it; (2) on occasion, he did tell the SSA that he was working; and (3) he told the SSA about his jobs whenever he was asked. Both parties now ask for summary judgment. After considering the materials presented, the Court concludes both motions must be denied.

**FACTS**

In 1996, when he was 17 years old, the Debtor was determined to have chronic

liver disease caused by autoimmune deficiency hepatitis. His mother applied for Social Security disability benefits for him, and he began receiving them in October 1996. The Debtor had his first liver transplant in December 1996. In connection with the transplant, he began taking anti-rejection drugs which can cause confusion as a side effect. In February and September of 1999, the Debtor completed SSA forms reporting that he had worked at several jobs between October 1997 and September 1999. The SSA suspended his disability benefits in September 1999 because he had engaged in "substantial gainful activity" that lasted for more than nine months. In fact, the SSA determined excess disability benefits had been paid, and must be repaid to the SSA; the Debtor contends his mother, not he, incurred this overpayment liability. In May 2000, the Debtor's mother agreed to refund the overpaid benefits.

In July 2000, the Debtor's mother notified the SSA that the Debtor was no longer working. The SSA determined he was once again eligible for disability benefits. At that time, he resumed receiving benefits, and became the payee for his own benefits and the representative payee for benefits paid to his minor child. According to an SSA employee, Janell Blaufuss, the Debtor was given a booklet and reminded that he was to report to the SSA any work activity he engaged in. The Debtor denies he received any booklet or reminder, and adds that his subsequent medical problems made him forget any such information given to him at that time. The Debtor's own affidavit says he held a job from July to October 2000, but the SSA has not relied on this information in its motion, so perhaps it is a misstatement.

3

In 2001, the Debtor suffered from liver transplant rejection. In August of that year, he received a second liver transplant. Before the transplant, he suffered from confusion and forgetfulness, which he thinks was caused by his reduced liver function and possibly by anti-rejection medicine. Despite these problems, he states in his affidavit that he held a job from July to October 2001. The Debtor also admitted he was sent a notice in February 2001 telling him that he continued to be eligible for disability benefits, but must report to the SSA: (1) if he started or stopped working, or (2) if he had previously reported working, whenever his duties or pay changed.

According to SSA employee Blaufuss, the agency's records contain nothing indicating the Debtor contacted the SSA about his work activity from January 2001 through January 2005. In his affidavit, the Debtor says he worked as a delivery driver from March to October in 2002, as a car salesman from December 2002 to October 2003, and again as a delivery driver from March 2004 until he signed the affidavit in April 2007. The SSA sent the Debtor notices in November 2004 advising him that his and his daughter's benefits were being increased to give them credit for the Debtor's earnings in 2003, which had not previously been used in determining the benefits. The Government claims these were automated actions that did not make the SSA aware the Debtor was working.

Another SSA employee, Tiffany Scholl, sent the Debtor two forms in January 2005 as part of a "Continuing Disability Review." One of the forms indicated the SSA needed information because the Debtor had "reported a change in work activity." The

4

Debtor somewhat vaguely asserts that he believes he spoke to someone at the SSA before he completed the forms, and is sure he would have disclosed his current job to that person. The Debtor personally completed parts of both the forms that Scholl sent him. Even though the Debtor was working as a delivery driver when he filled out the forms, on a "Report of Continuing Disability Interview" form, he marked a box indicating he felt he was unable to return to work. In a part of the form asking him to disclose any work he had done since he became disabled, he reported that he had worked from March 2002 to October 2002 as a delivery driver, and from December 2002 to October 2003 as a auto sales consultant. The other form, a "Work Activity Report - Employee," asked for somewhat more detailed information about his work since August 2000; it appears that before mailing the form to the Debtor, the SSA had already listed on it six employers' names and addresses, and dates the Debtor started and stopped working for them. The Debtor indicated on this form that the most recent time he had he worked for any of the listed employers was in October 2003. Although the form contained space for the Debtor to list additional employers, he did not do so. In fact, the Debtor did not report on either form that he was currently working at a job he had held since March 2004. According to SSA employee Scholl, the Debtor finally told her in April 2005 that he had been working for the same employer as a delivery driver for over a year. The Debtor claims he thought the SSA already knew about his current job when he completed the forms, and the agency was merely trying to establish the date in the past when his employment had made him ineligible for benefits.

5

SSA employees Blaufuss and Scholl both assert that a computer program automatically adjusts benefits based on beneficiaries' earnings records, and sends notices of changes in the benefits, although they do not explain how the data gets into the earnings records. The Government argues the earnings records do not give the SSA notice that a recipient of disability benefits has begun working because the benefit-adjustment process is handled completely by computer. However, both SSA employees state that a computer containing the Debtor's earnings record sent a "Continuing Disability Review enforcement" to the SSA's Wichita field office, and claim this initiated a review of the Debtor's eligibility to receive disability benefits. On the other hand, as indicated earlier, one of the forms Scholl sent to the Debtor said the review began because he reported a change in his work activity. In any event, the review ultimately led to the suspension of the Debtor's benefits in April 2005, and a determination that he had not been eligible for the benefits he received for himself and his daughter from August 2001 through April 2005. The overpayments were $36,458 and $18,215, for a total of $54,673. The Debtor concedes he is obliged to repay that amount to the SSA.

The Debtor filed his Chapter 7 bankruptcy petition on October 13, 2005. The Government points out that the Debtor failed to report on his Statement of Financial Affairs form that he had received income in the form of Social Security benefits during the two years immediately preceding his bankruptcy filing. In response, the Debtor concedes his SOFA was not "technically accurate" but claims the form "in its totality

6

disclosed the receipt of SSA benefits."[1] The Court reviewed the SOFA and could find nothing in it that suggests the Debtor ever received Social Security benefits. In fact, in all the forms the Debtor filed with his bankruptcy petition, information about Social Security is reported in only three places: (1) the last four digits of the Debtor's Social Security Number are listed on the petition; (2) the SSA is listed on Schedule F as a general unsecured creditor owed two debts; and (3) an amount for payroll taxes and Social Security is reported as a deduction from the Debtor's monthly earnings. The Government also points out, and the Debtor concedes, that the Debtor reported on his SOFA that he received unemployment income of about $3,800 in 2003 and about $2,200 in 2004. The Debtor admits that his bank statement and his testimony in a deposition indicate he received unemployment benefits in 2000 and 2001 as well. The Government further notes that in responding to its requests for admission, the Debtor represented that he had amended his SOFA to report the Social Security income he received during the two years before he filed for bankruptcy, but he has never actually done so. The Debtor responds that he had intended to amend his SOFA, but did not do so because the SSA's filing of this adversary proceeding notified the Chapter 7 trustee of the error in the SOFA and no one other than the SSA has objected to the Debtor's discharge.

The Debtor testified in a deposition that he usually files his tax returns in February. In his bankruptcy case, his discharge was granted on March 14, 2006. The SSA

---

[1] Debtor's Combined Memorandum in Support of Debtor's Motion for Summary Judgment and in Opposition to Plaintiff's Motion for Summary Judgment, Adv. No. 06-5118, Dkt. #53 at 4 (filed April 17, 2007).

7

intercepted the Debtor's refund for the 2005 tax year in early April 2006.

After the Debtor filed for bankruptcy, the SSA filed the complaint that commenced this proceeding, alleging the Debtor's obligation to repay disability benefits should be excepted from his discharge by § 523(a)(2)(A) as a debt for money obtained by "false pretenses, a false representation, or actual fraud." Both the SSA and the Debtor have now moved for summary judgment, submitting various affidavits, selections from a transcript of the Debtor's deposition, and copies of documents from the SSA's records about the Debtor to support their opposing positions.

In an affidavit submitted to support his position, the Debtor tries to contradict any inference that he purposely hid his employment from the SSA or deceived the agency so he would continue to receive benefits. He suggests the anti-rejection drugs he has taken following his transplants cause some confusion for him, and his companion tells him his memory is also declining. Before this proceeding was filed, he never perceived the SSA as an adversary, but instead felt the agency was helping him and his family. He asserts he always orally reported all his work activities to SSA employees. In one paragraph, he says:

> I believe an objective 3rd person would say that I still qualify for disability benefits. However, my nature, ambition, and upbringing cause me to want to work as much as my abilities allow and to try to better myself through education. I currently earn $12.73 per hour as a delivery driver in a forty (40) hour week.

The Debtor also claims he believed the SSA's disability program was designed to monitor his work, in part because of information SSA employees had about him and how they

8

conducted interviews with him. To support this belief, he points to the notices sent to him in November 2004 telling him his and his daughter's benefits were being adjusted because of his income in 2003. The Debtor adds that he does not remember being told of any duty to contact the SSA when his job situation changed. He says he thought it was enough for him to respond truthfully to inquiries about his employment status.

**DISCUSSION**

*1.     Summary judgment rules.*

Under the applicable rules of procedure, the Court is to grant summary judgment if the moving party demonstrates that there is "no genuine issue of material fact" and that the party "is entitled to a judgment as a matter of law."[2] The substantive law identifies which facts are material.[3] A dispute over a material fact is genuine when the evidence is such that a reasonable factfinder could resolve the dispute in favor of the party opposing the motion.[4] In adjudicating disputes, bankruptcy courts usually both determine the law and find the facts. In deciding a summary judgment motion, though, the Court is limited to its role of deciding legal questions, not weighing the evidence and resolving factual disputes, but merely determining whether the evidence favorable to the non-moving party about a material fact is sufficient to require a trial[5] at which the Court would act in its

---

[2] Fed. R. Civil P. 56(c), made applicable by Fed. R. Bankr. P. 7056.

[3] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[4] *Id*.

[5] *Id*. at 249-50.

9

factfinding role. Summary judgment is inappropriate if an inference can be drawn from the materials properly submitted either to support or oppose the motion that would allow the non-moving party to prevail at trial.[6]

The substantive law's allocation of the burden of proof also affects the Court's analysis of a summary judgment motion. The party asking for summary judgment has the initial burden of showing that no genuine issue of material fact exists.[7] But if the moving party does not have the burden of proof on a question, this showing requires only pointing out to the Court that the other party does not have sufficient evidence to support a finding in that party's favor on that question.[8] When such a showing is made, the party with the burden of proof must respond with affidavits, depositions, answers to interrogatories, or admissions sufficient to establish that a finding on the question could properly be made in the party's favor at trial.[9]

As a general rule, questions involving a person's intent or other state of mind cannot be resolved by summary judgment.[10] But in an exceptional case, a person's

---

[6] *See id*. at 248.

[7] *Shapolia v. Los Alamos Nat'l Lab.,* 992 F.2d 1033, 1036 (10th Cir. 1993).

[8] *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986).

[9] *Celotex,* 477 U.S. at 324; *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986).

[10] *Prochaska v. Marcoux*, 632 F.2d 848, 851 (10th Cir. 1980), *cert. denied* 451 U.S. 984 (1981); *see also* 10B Wright, Miller & Kane, *Fed. Prac. & Pro. Civil 3d*, §2730 (1998) (indicating actions involving state of mind can rarely be determined by summary judgment, except when the opposing party does not present sufficient circumstantial evidence to support a potential finding contrary to the person's professed state of mind).

"denial of knowledge may be so utterly implausible in light of conceded or irrefutable evidence that no rational person could believe it," making a trial on the question of the person's state of mind unnecessary.[11]

*2. The § 523(a)(2)(A) exception to discharge.*

Section 523(a)(2)(A) of the Bankruptcy Code excepts from discharge debts "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by — (A) false pretenses, a false representation, or actual fraud." In assessing claims under this provision, "[t]he bankruptcy court must consider whether the totality of the circumstances 'presents a picture of deceptive conduct by the debtor which indicates an intent to deceive the creditor.'"[12] Here, the Debtor concedes he owes the debt involved in the SSA's § 523(a)(2)(A) claim, but disputes whether the debt should be excepted from discharge. Establishing an exception to discharge based on misrepresentation requires proving the following elements: (1) the debtor made a representation; (2) at the time of the representation, the debtor knew it to be false; (3) the debtor made the representation with the intent to deceive the creditor; (4) the creditor justifiably relied on the representation; and (5) the creditor sustained damage as a proximate result of the debtor making the representation.[13] The SSA has the burden of proving all these elements by a

---

[11]*In re Chavin*, 150 F.3d 726, 728-29 (7th Cir. 1998).

[12] *Groetken v. Davis (In re Davis)*, 246 B.R. 646, 652 (10th Cir. BAP 2000), *quoting* 3 William L. Norton, Jr., Norton Bankruptcy Law and Practice 2d 47:16, n. 62 (1999).

[13] *E.g., Fowler Bros. v. Young (In re Young),* 91 F.3d 1367, 1373 (10th Cir. 1996) (identifying these five elements of § 523(a)(2)(A) claim, but requiring creditor's reliance to be reasonable); *Field v. Mans*, 516 U.S. 59, 69-76 (1995) (reliance under § 523(a)(2)(A) need only be justifiable, overruling

11

preponderance of the evidence.[14] Because the SSA's claim here is that the Debtor fraudulently failed to report his jobs to the agency, the Court notes that a debtor's silence regarding a material fact can be covered by § 523(a)(2)(A).[15]

3.  *Neither party has established a right to summary judgment.*

After carefully considering the materials presented, the Court concludes neither the SSA nor the Debtor has established that summary judgment should be granted. The SSA has pointed to various circumstances that could support a finding that the Debtor deliberately failed to inform the agency at various times that he was working, but the Debtor denies that he acted with any fraudulent intent. The evidence is not such that the Debtor's denial is "so utterly implausible . . . that no rational person could believe it."

The Debtor contends the SSA does not have sufficient evidence to support findings in its favor that: (1) the Debtor intended to deceive the SSA by failing to report his work activities; (2) the SSA relied on the Debtor to report work activities; (3) the SSA's reliance on the Debtor's failure to report work activities was justifiable; and (4) the Debtor's failure to report work activities proximately caused the SSA to pay him benefits

---

*Fowler Bros.* to extent it required reliance to be reasonable).

[14] *Grogan v. Garner*, 498 U.S. 279, 287 (1991).

[15]*See Wolstein v. Docteroff (In re Docteroff)*, 133 F.3d 210, 216 (3rd Cir. 1997); *Caspers v. Van Horne (In re Van Horne)*, 823 F.2d 1285, 1288 (8th Cir. 1987), *abrogated in part on other grounds by Grogan v. Garner*, 498 U.S. 279 (1991); *see also* 4 *Collier on Bankruptcy*, ¶ 523.08[1][e] at 523-45 (Resnick & Sommer, eds.-in-chief 15th ed. Rev. 2007) ("Actual fraud . . . consists of any deceit, artifice, trick, or design involving direct and active operation of the mind, used to circumvent and cheat another — something said, done or omitted with the design of perpetrating what is known to be a cheat or deception").

12

he was not entitled to receive.  In *Field v. Mans*, the Supreme Court indicated that the § 523(a)(2)(A) discharge exception incorporates the generally accepted common law concerning false pretenses, false representations, and actual fraud, and that the Restatement (Second) of Torts published shortly before Congress adopted the provision in 1978 gives the best guidance concerning that common law.[16]  The Court will therefore rely on that Restatement in addressing the Debtor's arguments.

The Debtor argues his failure to report working was merely a breach of contract that cannot amount to fraud.  Section 551 of the Restatement (Second) of Torts says that in business transactions, nondisclosure of a fact that one has a duty to disclose creates the same liability as representing the nonexistence of the fact would, and indicates a duty to exercise reasonable care to disclose arises when information one acquires later would make a previous representation either untrue or misleading.[17]  In this case, when he applied for and began receiving disability benefits, the Debtor would have represented to the SSA that he was unable to work, and when he later began to work, this representation would have become untrue.  Consequently, the Restatement makes clear the Debtor's failure to inform the SSA when he began working could constitute not just a breach of contract, but also fraud.

The Debtor suggests the SSA cannot prove he intended to defraud it because he

---

[16]516 U.S. 59, 70 (1995).

[17]*Restatement of the Law (Second), Torts 2d*, vol. 3, § 551, p. 119 (adopted by American Law Institute 1976, © 1977).

claims he thought the SSA knew of his earnings and the SSA can produce only one document, given to him before his second liver transplant, that informed him of a duty to report changes in his work status to the agency. The Court cannot agree. The fact the Debtor was receiving Social Security disability benefits based on his inability to work while he was actually working is sufficient to permit a rational factfinder to infer that he intended to deceive the SSA by failing to report that he was working. The factfinder will have to decide whether to believe the Debtor's assertions that: (1) he thought the SSA knew when he was working even though he did not report that fact to the agency, and (2) he forgot that the SSA had told him to report if he began to work.

The Debtor contends the SSA's alleged reliance on his failure to report that he was working cannot constitute justifiable reliance. The Restatement (Second) of Torts explains that the "recipient of a fraudulent misrepresentation of fact is justified in relying upon its truth, although he might have ascertained the falsity of the representation had he made an investigation,"[18] and that the "recipient of a fraudulent misrepresentation is not justified in relying upon its truth if he knows that it is false or its falsity is obvious to him."[19] The Government suggests the SSA cannot immediately discover that a recipient of disability benefits has begun working because payroll taxes are paid to the IRS, not the SSA, and the IRS does not report earnings to the SSA until some time later. This problem, the Government says, is shown by the fact the notices the Debtor was sent in

---

[18] 3 *Restatement (Second) of Torts*, § 540, p. 88.

[19] 3 *Restatement (Second) of Torts*, § 541, p. 88.

14

November 2004 adjusted his and his daughter's benefits based on his earnings from the previous year, 2003. The Government also points out that about 48 million people were currently receiving payments in 2005, and suggests this large number also hinders the SSA's ability to discover when a disability recipient begins working. Under the circumstances, the Court believes the Government's evidence would permit a rational factfinder to conclude the agency's reliance on the Debtor to report any time he began working was justifiable.

Finally, the Debtor argues his failure to report his work status was not the proximate cause of the overpayments made to him, or at least was not the cause of all of them, because the SSA's own computer adjusted his and his daughter's benefits based on his earnings record, and ultimately, in December 2004, triggered the review that led to the suspension of his benefits. Instead, he claims, the SSA's own failure to cross-reference its payroll records and disability benefits records was an equal cause of the overpayment of benefits. But the Restatement (Second) of Torts says, "One who justifiably relies upon a fraudulent misrepresentation is not barred from recovery by his contributory negligence in doing so."[20] This means if the Government can convince the factfinder that the Debtor's failure to report when he began working was a fraudulent misrepresentation on which the SSA justifiably relied, the fact the SSA might have been negligent in failing to discover sooner that the Debtor was working would not bar it from recovering the

---

[20] 3 *Restatement (Second) of Torts*, § 545A, p. 100.

15

benefits it paid to the Debtor when his working made him ineligible to receive them.

**CONCLUSION**

The Court is convinced the evidence presented so far is such that the factfinder would be authorized to decide this case in either party's favor. The opposing summary judgment motions must be and they are hereby denied.

# # #